**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-198 (APM)** |
| **CURTIS DAVIS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence Curtis Davis to 48 months of incarceration, followed by three years of supervised release, $2000 restitution and the mandatory assessment of $100 for his felony conviction. That would represent an upward variance of 15 months above the top of the stipulated guidelines range. For the reasons discussed below, in light of Davis' relentless and vicious assaults against numerous police officers in or near the Rotunda on January 6, coupled with his history of previous assaults, such a sentence would be "sufficient but not greater than necessary" to satisfy the sentencing factors of 18 U.S.C. § 3553(a).

## I.      INTRODUCTION

The defendant, Curtis Davis, violently participated in the January 6, 2021 attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured

more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Just after 3:00 p.m., Davis, a self-employed vinyl siding business owner, stormed into the U.S. Capitol through the East Rotunda doors and attacked multiple police officers inside and around the Rotunda, by attempting to grab an officer's baton, punching at least two officers in the helmets and ripping a riot shield from the hands of another officer. After being forced out of the East Rotunda doors, he tried to forcibly reenter and punched another officer's riot shield multiple times. On the evening of January 6, 2021, while outside on the street after the curfew instituted in D.C., Davis bragged to others around him about punching officers' "faces."

The government recommends that the Court sentence Davis to 48 months of incarceration. A 48-month sentence reflects the gravity of Davis's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 29, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

election.

**B.  Davis's Role in the January 6, 2021 Attack on the Capitol**

Shortly after 3:00 p.m. on January 6, 2021, Davis and Tanya Bishop entered the U.S. Capitol building through the East Rotunda doors in the midst of a full-blown riot. Davis and Bishop quickly advanced to the Rotunda where officers of the United States Capitol Police ("USCP"), federal officials then performing their official duties to protect the Capitol building, assisted by officers of the Metropolitan Police Department ("MPD"), were attempting to disperse the crowd of rioters in that location.   The USCP and MPD officers were outfitted in helmets, face-shields, and additional body-padding, or "riot gear."

At approximately 3:07 p.m., Davis and Bishop were standing face to face with a line of MPD officers inside the Rotunda. At that time, Davis forcibly attacked MPD Sergeant M. H. and attempted to grab and snatch Sergeant M.H.'s police baton, thereby making physical contact with him as shown below in Government Exhibits ## 1-3.



*Government Exhibit # 1 at 00:05 Body-worn camera from Sergeant M.H. showing Davis (red circle) reaching towards Sergeant M.H.'s baton with Bishop (blue circle) nearby[2]*



*Government Exhibit # 2 at 00:07 Body-worn camera video showing Davis (red circle) reaching towards Sergeant M.H.'s baton*

---

[2] Government Exhibit # 4 from approximately 5:00 until 5:30 shows the same event from Capitol Police surveillance footage.

4



***Government Exhibit # 3 at 00:04 Body-worn camera video showing Davis (red circle)
pulling on Officer M.H.'s baton***

Davis also aggressively yelled at the officers, and at one point, was physically held back by

Bishop.



***Image # 1: Photograph of Davis (red circle) being held back by Bishop (blue circle)[3]***

At approximately 3:09 p.m., Davis pushed forward through the crowd of rioters and punched an MPD officer in the face shield, thereby making physical contact with the officer as shown below in Government Exhibit # 4.

---

[3] Government Exhibit # 3 from 00:14 – 00:18 provides another angle of Davis aggressively yelling at police and being held back by Bishop.



***Government Exhibit # 4 at 6:41 Capitol Police surveillance video of Davis (red circle) punching officer (yellow arrow) the face shield***

As the officers continued to push rioters out of the Rotunda, Davis and Bishop pushed back. As shown below in Government Exhibit # 5, Davis and Bishop had to be forcibly removed from the Rotunda by police.



***Government Exhibit # 5 at 00:01 Davis (red circle) and Bishop (blue circle) being pushed from the rotunda by police officers[4]***

At approximately 3:17 p.m., at one of the doors to the Rotunda, Davis forcibly attacked MPD Officer A.J. by punching him in the head while he was wearing a helmet, thereby making physical contact with him.

---

[4] Government Exhibit # 5 at approximately 00:10 – 00:25 also shows Davis and Bishop pushing back against the police into the Rotunda.



*Government Exhibit # 6 at 1:20 Third-party video of Davis (red circle) winding up with a closed fist*



*Government Exhibit # 6 at 1:26 Third-party video of Davis's fist (red arrow) striking Officer A.J. (yellow circle) in the helmet and face shield*

One minute later, at approximately 3:18 p.m., Bishop had grabbed a hold of an officer's riot shield and pulled on it as she was being pushed from the Rotunda by the officer. Davis joined in and forcibly ripped the riot shield from the officer's hands, thereby making physical contact with the officer. Immediately thereafter, Davis forcibly pushed the face of the shield against the backs of a line of rioters who were directly confronting police, adding his strength and weight to the collective thrust against the police line.



*Government Exhibit # 7 at 1:47 Davis (red circle) and Bishop (blue circle) pulling riot shield (red arrow) from officer at the entrance to the Rotunda[5]*

---

[5] Government Exhibit # 8 at 00:52 until 1:38 shows this event from a different angle.



***Government Exhibit # 7 at 1:50 Davis (circled in red) pressing shield into the backs of
rioters pushing police back into the Rotunda***

After being pushed from the Rotunda, Davis and Bishop remained in the foyer area between
the East Rotunda Doors and the Rotunda where other rioters continued to battle police. Officers
had to forcibly remove Davis and Bishop from the building through the Rotunda Doors at
approximately 3:35 p.m.

Davis and Bishop returned to the Rotunda Doors at approximately 3:43 p.m. Davis made
his way to the front of the mob of rioters near those doors and, joined by some of his fellow
rioters, tried to push his way back into the building. Police officers held up riot shields blocking
the open door. Davis forcibly punched one of those riot shields three times, thereby made physical
contact with the officer carrying the shield.

11



**Government Exhibit # 9 at 1:37 Davis pushing with other rioters at the East Rotunda Doors**



***Government Exhibit # 10 at 4:30 Davis (red circle) pushing against police shields right before he begins repeatedly punching one shield***



*Government Exhibit # 11 at 00:37 Third Party Video of Davis (red circle) punching police shield while Bishop (blue circle) tries to push back into the Capitol building*

After exiting the Capitol building, while Davis was recording a video of her on his mobile telephone, Bishop climbed on top of a law enforcement vehicle and yelled to the crowd through a megaphone. Bishop encouraged others to remain in the Capitol building and asked other rioters that were walking away from the Capitol Building, "Why is everybody walking the wrong way?" Bishop further stated, "this is our one chance" and "I'm ready to go back in, because this is our fucking building."

***Davis' Post-Riot Recorded Statements***

Following the riot, on the evening of January 6, Davis and others were standing outside of a hotel in Washington, D.C. MPD Officers were present across the street to enforce a curfew then in effect in D.C. in response to the riot.   Davis filmed the officers on his mobile phone before he pointed the camera at his fist and stated, "them knuckles right there, from one of those

motherfucker's faces at the capitol." Gov. Ex. 12. In another video, Davis said, "I done been through some shields today goddammit, we're going through some more, they aint got shields." Gov. Ex. 13.

## III.    THE CHARGES AND PLEA AGREEMENT

On April 24, 2024, the United States filed an information charging Davis with one count of Assaulting, Resisting, or Impeding Certain Officers,18 U.S.C. § 111(a)(1). On, June 10, 2024, this Court convicted Davis of that offense based on a guilty plea entered pursuant to a plea agreement.[6]

## IV.    STATUTORY PENALTIES

Davis now faces sentencing for one count of Assaulting, Resisting, and Impeding a Federal Officer in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Davis faces up to 8 years of imprisonment, a fine of $250,000, and a term of supervised release of not more than 3 years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

---

[6] The Information charges the defendant with assaulting Officer M.H. The Statement of Offense ¶ 9 lays out a sufficient factual basis for his guilty plea to the Information. The "Elements of the Offense" and "Defendant's Acknowledgements" Sections in the Statement of Offense ¶¶ 19-20 references the defendant's assaults on Officer A.J. For clarity of the record, and with the defendant's consent, the government asks to amend the ¶¶ 19-20 of the Statement of Offense to reflect a plea to the assault against Officer M.H.

(2007). As stated in the PSR and the plea agreement, the parties agreed to the below Guidelines

analysis. PSR ¶ 7.

Count Three: 18 U.S.C. § 111(a)(1)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Acceptance of responsibility (U.S.S.G. §3E1.1)                                  -3

**Total Adjusted Offense Level:**                                              **17**

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated Davis's criminal history as category II, which is not

disputed. PSR ¶ 55. Accordingly, Davis's Guidelines imprisonment range is 27 to 33 months. PSR

¶ 104.   The plea agreement provides that both parties may seek a variance outside the stipulated

range. Plea Agreement at ¶ 6.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Davis's felonious conduct on January 6,

---

[7] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Davis stormed into the Capitol building with his codefendant, Tanya Bishop, and added to the chaos and disorder inside the Rotunda area. Davis grabbed an officer's baton, punched officers in their helmets, ripped a riot shield from an officer's hands with his codefendant, and tried to force his way back into the Capitol a second time after being expelled by police. The nature and circumstances of Davis's offense are of the utmost seriousness, and fully support the government's recommended sentence of 48 months of incarceration.

Although Davis was allowed to plead guilty to a single assault, the evidence established that, in a spasm of violence, he assaulted five different police officers at five different times during the riot. In fact, had he plead guilty to each of those assaults, four additional units would have been added to the offense level, thus placing him at a guidelines range of 41-51 months, consistent with the government's recommended sentence of 48 months of incarceration.

Furthermore, although Davis's 1998 conviction for assault was too old to add criminal history points, that assault further shows he is someone who has refused for decades to settle his grievances peacefully. As such, the Guidelines range in this case does not nearly capture the extent of his criminality on January 6, and strongly supports an upward variance.

### B. Davis' History and Characteristics

Davis is a former welder and self-employed vinyl siding business operator PSR ¶¶ 88-93.

Davis's assaultive crimes on January 6 were not isolated events in an otherwise law-abiding life. They came, instead, after other violent crimes. That history weighs heavily in favor of a

lengthy period of incarceration:

- In 1998, following a trial, a North Carolina jury convicted Davis of Assault Inflicting Serious Injury. The court sentenced him to 16 months of imprisonment, 36 months of probation, fines and restitution. PSR ¶ 53.

- In 2011, at the age of 30, Davis pleaded guilty to Assault with a Deadly Weapon with Intent to Kill, a decidedly horrendous offense. The court sentenced him to 24 to 38 months of incarceration followed by 20 months of probation, fines and restitution. PSR ¶ 54. He violated the conditions of his probation in that case.   *Id.*

- In 2010 Davis was charged but not convicted of Assault on a female victim with a Deadly Weapon Causing Serious Injury.   PSR ¶ 58.   In February 2021, just one month after his crimes on January 6, he was again charged with Assault with A Deadly Weapon with Intent to Kill, but was not convicted.   PSR ¶ 60.

Davis's criminal history demonstrates his violent propensities, which is hard to square with his claim of experiencing a "great childhood[.]" *See* PSR ¶¶ 66. Thus, his criminal history score does not entirely reflect the nature of his past, coupled with the crime in which he currently faces sentencing.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Davis's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to specifically deter Davis also weighs heavily in favor of a lengthy term of incarceration.

First, Davis's history of arrest and conviction shows a clear pattern of assaultive behavior. *See* Section VI(B) *supra.* Second, although Davis has now expressed remorse and contrition, the recordings of his statements on the evening of January 6, clearly shows that he did not feel any remorse for punching police officers shortly after the riot.  That means this Court should take Davis's belated expressions of remorse with a grain of salt.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.")

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

(statement of Judge Chutkan). The sentence must be sufficient to provide specific deterrence from Davis committing future crimes of violence, particularly in light of his history of violent assault.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious,

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Salvador Sandoval Jr.* 21-cr-00195 (CKK), Much like Davis, Sandoval entered the Capitol through the East Rotunda Doors and spent approximately 15 minutes inside obstructing, impeding, and assaulting police officers. While inside the Rotunda, Sandoval obstructed several MPD officers, grabbed the riot shield of an MPD Officer, and along with another rioter, ripped it from the Officer's hands. Afterwards, in the vestibule between the East Rotunda Doors and the Rotunda, the defendant continued to push other MPD and USCP officers and tried to remove a riot shield from another officer. Judge Kollar-Kotelly sentenced Sandoval to 88 months of incarceration, 36 months supervised release and $2000 in restitution for convictions to 18 U.S.C. §§ 111(a)(1), 231(a)(3), and 1512(c)(2).

Davis's conduct is strikingly similar to Sandoval's in that he stormed the building through the Rotunda doors, attempted to rip a baton away from one officer, punched two officers, and

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

ripped a riot shield away from another officer before using it to press on the backs of other rioters to assist pushing the police line back into the Rotunda. The main difference, which accounts for the lower recommendation in this case, is that the Davis was not charged with, or convicted of obstruction of the Electoral College certification vote in violation of 18 U.S.C. § 1512(c)(2) Also, Davis, unlike Sandoval, has taken responsibility for his actions.

In *United States v. Cale Clayton* 22-cr-00139 (RCL), the defendant pled guilty to one count of violating 18 U.S.C. § 111(a)(1).   Clayton grabbed one officer's shield and stealing another officer's baton on the Upper West Terrace.   He then retreated from the police line and stole a third officer's shield and took it with him into the crowd. Clayton then walked towards the police line flaunting the stolen police baton.   When police attempted to retrieve it, Clayton resisted by shoving Montgomery County Police Department ("MCPD") Officer in the head and grabbing his face mask. Judge Lamberth sentenced Clayton to 30 months incarceration followed by 24 months supervised release.

While Davis's conduct is similar to Clayton's, the sheer number of officers assaulted by Davis and the nature of his assaults makes his conduct worse and worthy of a higher sentence. Both Davis and Clayton attempted to pull a baton away from a police officer and successfully stole a riot shield from an officer and used it to push back against the police line. While Clayton shoved an officer in the head and grabbed his facemask, Davis, in a spree of assaults, actually punched two different officers in the face shield of their protective riot helmets with a closed fist. While Clayton's conduct occurred outside the building, Davis forced entry through the Rotunda doors and assaulted officers inside the Rotunda area. After being expelled from the building by police,

Davis returned for more and tried to forcibly reenter a second time and punched an officer's riot shield multiple times after he was blocked from doing so.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The   victim officers did not suffer bodily injury as a result of Davis's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Davis must pay $2,000 in restitution, which reflects in part the role Davis played

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

in the riot on January 6.[12] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Davis's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 123.

The $2,000 restitution payment fairly reflects Davis's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Davis was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Davis's conviction for violation of 18 U.S.C. § 111(a)(1) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Davis's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in

---

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Davis to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Davis has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $5,000 to $50,000. U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 48 months of incarceration, followed by three years of supervised release, $2000 restitution and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    *s/ Kyle R. Mirabelli*
       Kyle R. Mirabelli
       Assistant United States Attorney
       NY Bar No. 5663166
       Capitol Siege Section
       U.S. Attorney's Office
       District of Columbia
       Telephone No: (212) 252-7884
       Email Address: kyle.mirabelli@usdoj.gov